IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

IN RE: LORI KAYE BACON, DEBTOR            CASE NO.: 4:10-bk-12116
                                          CHAPTER 13

## MEMORANDUM OPINION AND ORDER

On June 21, 2010, Lori Kaye Bacon, the debtor ("debtor"), obtained confirmation of her plan of reorganization. Thereafter, the debtor sought to modify her plan. Mark T. McCarty, the Chapter 13 Standing Trustee ("trustee"), filed his *Objection to Confirmation of Plan as Modified Post-Confirmation on 11/24/2010* ("Objection"). For the reasons stated below, the Objection is sustained.

### I. Jurisdiction

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rules of Bankruptcy Procedure 9014 and 7052.

### II. Findings of Fact

The debtor filed her Chapter 13 voluntary bankruptcy petition and initial plan on March 25, 2010. (Trustee Ex. 1.) The debtor is married. Her husband, however, did not file.[1] In her schedules, the debtor listed $110,514 in unsecured credit card debt. (Trustee Ex. 3 at 17-18.) The debtor's schedules and statements further reflect that she is an above-median income debtor. (Trustee Exs. 3, 4.)

---

[1] Neither the debtor nor the trustee identified the debtor's husband as anything other than "Mr. Bacon" or the debtor's "husband."

Entered On Docket: 05/27/2011

Also on March 25, 2010, the debtor filed her initial *Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income* ("First Statement"). (Trustee Ex. 4.) The debtor listed her monthly income at $5,641.77 and her husband's monthly income at $6,991.01. (Trustee Ex. 4 at 38.) The resulting calculations reflected a section 1325(b)(2) monthly disposable income of $1,141.87. (Trustee Ex. 4 at 44.) The debtor's initial plan proposed a monthly payment of $1,625 and suggested an unspecified pro rata percentage distribution to unsecured creditors. (Trustee Ex. 5 at 1.)

On April 28, 2010, the trustee objected to this initial plan, specifically the determination of disposable income. (Trustee Ex. 6.) Shortly thereafter, on May 21, 2010, the debtor filed amended Schedules I and J, an amended form 22C ("Amended Statement"), and a *Modification of Chapter 13 Plan* ("First Modification"). (Trustee Exs. 7, 8, 11.) The Amended Statement reflected a revised monthly disposable income under section 1325(b)(2) of $1,534.17. (Trustee Ex. 7 at 7.) The First Modification proposed to pay $1,745 per month until August 2012. (Trustee Ex. 8.) Thereafter, the debtor's payments would increase incrementally: $2,645 a month beginning September 2012, until May 2013; $3,020 in June 2013; and then $3,330 a month beginning August 2013, until plan completion.[2] (Trustee Ex. 8.) The court confirmed this First Modification on June 21, 2010, and it became the operative plan ("Plan"). (Trustee Ex. 1 at 5.)

On November 24, 2010, approximately five months after confirmation of her Plan, the debtor filed a second *Modification of Chapter 13 Plan* ("Second Modification"). (Trustee Ex.

---

[2] Although the First Modification states that the unsecured creditors "are to be paid a pro-rata dividend[,]" the testimony at trial was that the step payments would result in a 100% distribution to unsecured creditors. (Trustee Ex. 8 ¶ 3.)

2

9.) The Second Modification sought to reduce the step payments as follows: $1,085 per month until August 2012; thereafter $1,985 through May 2013; June and July 2013 payments of $2,360 each; then, beginning August 2013, payments of $2,670 a month until plan completion. (Trustee Ex. 9.) This proposed Second Modification results in a less than 100% payout to unsecured creditors. The trustee again objected.

In his Objection, the trustee calculates that the Second Modification reduces the dividend to unsecured creditors to approximately 70%. The trustee now scrutinizes the debtor's expenses; he had not done so previously based on the anticipated 100% distribution. The questioned expenses fall into two categories. First, previously reported expenses that the trustee now wishes to question because the unsecured creditors will no longer receive a full 100% distribution under the proposed Second Modification. These expenses consist of $800 for the husband's credit cards, $375 for private school payments made solely by the debtor's husband, and $80 a month for the husband's bowling league expenses. (Trustee Ex. 11 at 4.)

Second, the trustee questions post-confirmation expenses occasioned by the debtor's husband purchasing a 2010 Cadillac CTS. Specifically, the debtor's aggregate insurance increased from $171 a month to $300 a month. (Trustee Ex. 11 at 3; Ex. 12 at 3.) Also, her husband obligated himself to a $529.56 monthly car payment for six years, an increase in expenses for which the debtor now correspondingly seeks to reduce her plan payments. (Trustee Ex. 12 at 4.)

The Second Modification is a direct result of the purchase of the Cadillac CTS. At filing, the debtor's husband drove a 1993 Chevrolet Lumina with 90,000 miles. (Trustee Ex. 3 at 12.) The debtor's Schedules B and C noted ownership by "salvage title." (Trustee Ex. 3 at 12.) The

3

debtor listed the vehicle as jointly held with $500 representing her one-half value.  (Trustee Ex. 3 at 12.)

At the time of filing, the debtor owned a 2005 GMC Yukon XL.  (Trustee Ex. 3 at 12.) She purchased the GMC Yukon XL because she needed more room for baby strollers; she previously drove a 2005 Cadillac Escalade.  The debtor's husband purchased a Cadillac CTS in September 2010, less than three months after confirmation of the debtor's Plan.  (Trustee Ex. 12 at 4.)  The debtor's husband made the purchase without any meaningful discussion with the debtor.  He simply alluded to the fact that he was looking at cars and subsequently bought the Cadillac CTS without the debtor's direct knowledge.  Neither the debtor nor the debtor's husband made an effort to review their budget or determine the fiscal appropriateness of the purchase.  The debtor testified that she did not think her husband put any money down at the time of purchase.

In addition to the new car payment, the debtor's car insurance expenses increased.  The increased insurance premium is either a result of the purchase of the Cadillac CTS or a residual effect of the husband's three pre-petition DUIs.[3]  The record is not completely clear on this point, but the debtor did testify that the rate did not go up until after the purchase of the Cadillac CTS.  Patricia Davis, a Modification Specialist with the trustee's office, testified that an insurance premium of $225 to $250 a month, which is less than the sum now paid by the debtor, is generally more appropriate for a two-adult home.

---

[3] Following her husband's DUI and the temporary suspension of his driver's license, the debtor and her husband sold his Mercedes and purchased the Chevrolet Lumina.  The Chevrolet Lumina was subsequently fitted with an alcohol detection device for her husband's use once his license was reinstated.

4

Although the debtor's husband is not currently in a bankruptcy proceeding, the record reflects that he is in a rather precarious financial condition. Specifically, his gross monthly income is $7,008.28. (Trustee Ex. 12 at 1.) His standard deductions result in an average monthly income of $4,128.42. (Trustee Ex. 12 at 1.) His payroll deductions include miscellaneous deductions of $1,201.88, which encompass $473 in child support and at least one 401(k) loan payment of $309.42. (Trustee Ex. 12 at 1, 4.) The debtor's husband also budgets $800 a month for his credit card payments. This figure represents his minimum monthly payments. (Trustee Ex. 12 at 4.) As noted above, the debtor has credit card debts in excess of $100,000. (Trustee Ex. 3 at 17-18.) The debtor's husband also pays private school tuition of $375 a month for a child from a previous marriage. (Trustee Ex. 12 at 4.)

The court held a hearing on the trustee's Objection on April 13, 2011, and took the matter under advisement.

### III. Discussion

In the present case, the debtor seeks to modify her Plan pursuant to 11 U.S.C. § 1329. Section 1329(a) governs the modification of chapter 13 plans and provides as follows:

> (a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to—
> (1) increase or reduce the amount of payments on claims of a particular class provided for by the plan[.]

11 U.S.C. § 1329(a)(1) (2011). "Section 1329(a)(1) contemplates modified plans based on changed circumstances that may increase or decrease payments to unsecured creditors." *In re Ireland*, 366 B.R. 27, 33 (Bankr. W.D. Ark. 2007) (approving a proposed modification under section 1329 based on the debtors' substantial reduction in income). "To avoid the preclusive

5

effect of the principle of res judicata, the modification should be necessitated by an *unanticipated substantial change in circumstances* affecting the debtors' ability to pay." *Id.* (emphasis added) (citations omitted); *see also Educ. Assistance Corp. v. Zellner*, 827 F.2d 1222, 1226 (8th Cir. 1987) (noting in dicta that a debtor could request a modification of his plan at a later date if he could "show a substantial change in [his] ability to pay"); *In re Savage*, 426 B.R. 320, 324 (Bankr. D. Minn. 2010) (recognizing the long-standing principle that a debtor "must demonstrate some form of 'cause' for [a] modification"); *In re Justice*, 418 B.R. 342, 345 (Bankr. W.D. Mo. 2009); *In re Nelson*, 189 B.R. 748, 751 (Bankr. D. Minn. 1995) (stating that "[w]hen a proposed modification to the plan would reduce the plan payments, the burden falls on the debtor to demonstrate that her circumstances have sufficiently changed adversely, to warrant the modification"). Accordingly, although not explicitly detailed in section 1329, a debtor must prove not only a substantial change in circumstances that affects his or her ability to make payments pursuant to a confirmed plan, but he or she must also put forth evidence that the substantial change was unanticipated.

In *Nelson*, the bankruptcy court analyzed a debtor's contention that "due to [an] unanticipated and adverse change in circumstances" she should be able to modify her plan "in accordance with 11 U.S.C. § 1329." 189 B.R. at 749. The debtor argued that her expenses had increased unexpectedly postconfirmation due to her husband's disability. *Id.* at 750. The trustee opposed the debtor's request to modify her plan and argued that the debtor's increased expenditures were not unanticipated but rather of the debtor's own making. *Id.* In examining the debtor's requested modification, the court considered the debtor's "income [and] expenses," "medical condition," and "the debtor's post-confirmation conduct, in contemplating changed

6

circumstances." *Id.* at 751 (citation omitted). The court concluded that "any difficulties that [the debtor] might have in funding her Amended Plan payments are the result of her own voluntary conduct and decisions," including her post-confirmation purchase of a new vehicle, which resulted in a new monthly car payment and an increase in her car insurance. *Id.* "Debtor's purchase of the vehicle was unnecessary and inappropriate." *Id.* Since the debtor's post-confirmation circumstances were defined by her "voluntary conduct and decision making, and were not unanticipated or unforeseen," the court denied the debtor's proposed modification. *Id.* at 752.

Prior to determining whether the debtor's Second Modification meets the "unanticipated substantial change in circumstances" standard, the court must analyze what changes have occurred postconfirmation that now render the debtor's Plan unfeasible. At trial, the debtor testified that she incurred additional expenses associated with the purchase of the 2010 Cadillac CTS three months after her Plan confirmation. This purchase produced a new monthly car payment of $529.56 and increased the debtor's monthly car insurance.

Although the debtor's husband is not currently in a bankruptcy proceeding, his income and expenses affect the success of the debtor's Plan. "When a debtor seeks Chapter 13 relief, 'the entire family is affected by the sacrifices and special efforts required by the Code. [A] family may not continue its prepetition lifestyle to the detriment of creditors.'" *In re Trimarchi*, 421 B.R. 914, 923 (Bankr. N.D. Ill. 2010) (citation omitted) (finding that a non-debtor spouse's monthly payment of $250 for a heated swimming pool was a luxury item and "not a basic need required by the average American family"). *See also*, *In re Roppo*, 442 B.R. 888, 896 (Bankr. N.D. Ill. 2010) (finding that the debtor's ownership of two luxury vehicles "exceeds what is

7

reasonably necessary to live in a modest and thrifty way"); *In re Daniel*, 260 B.R. 763, 765, 768 (Bankr. E.D. Va. 2001) (denying confirmation of a debtor's plan after analyzing the debtor and non-debtor husband's expenses for private school, country club membership dues, and other luxury items and declaring that "[d]ebtors do not have an entitlement, at the expense of their creditors, to maintain their prepetition lifestyles and status in society, especially when their prior lifestyles 'were characterized by luxury, excessive consumption of nonessentials, or inordinately high expenditures for purchases of necessities'").

In the present case, the debtor's Second Modification was occasioned by the debtor's husband purchasing a 2010 Cadillac CTS to replace his 1993 Chevrolet Lumina, which needed repair but was still in working condition. The purchase directly affected the debtor's ability to perform under her Plan due to the new monthly car payment and the increased car insurance premiums. The debtor's husband neglected to engage in detailed discussions with the debtor concerning the purchase. Her husband ignored the obvious and immediate effects this purchase would have on the debtor's ability to meet her Plan obligations. The deliberate decision to purchase the Cadillac CTS did not result from an unanticipated substantial change in circumstances. Rather, the increased expenditures are the direct result of the debtor's husband purchasing a luxury item in an attempt to continue living the lifestyle to which he is accustomed without any regard for the debtor's financial obligations set forth in the Plan.

This is not to suggest that a debtor or non-filing spouse is forever bound by the terms of a plan and thus proscribed during a three to five year period from purchasing a new vehicle or incurring some other reasonably appropriate and necessary expenses. In this instance, the debtor's husband purchased the vehicle very shortly after confirmation of the Plan—a plan

carefully drafted with all the necessary and appropriate attendant calculations.  If a new vehicle was in the family's immediate future, the debtor could have made it known and provided for that exigency in her Plan.  Her creditors would then have had the opportunity to reasonably review all of the expenses and frame any response.  Conversely, a post-confirmation decision to purchase a new vehicle should result from careful consideration and a balancing of the need for the new vehicle, a reasonable cost, and the effect that the purchase might have on a confirmed plan.  A purchase application with commensurate modification, or solely a modification, accompanied by a strong factual basis consistent with the appropriate code sections, could achieve the desired effect.  A cavalier, extravagant, and hasty post-confirmation purchase, handed to the creditors as a *fait accompli*, does not achieve that result.

The debtor's increased expenditures are occasioned by the voluntary conduct and decision making of the debtor and the debtor's husband—not an unanticipated set of changed circumstances.  Their actions are consistent with their pre-bankruptcy financial immaturity, a pattern the Plan now legally constricts.

### IV. Conclusion

For the reasons stated herein, the trustee's Objection is sustained.

IT IS SO ORDERED.

Dated this 26th day of May, 2011.

_____
RICHARD D. TAYLOR
UNITED STATES BANKRUPTCY JUDGE

cc:    Lori Kaye Bacon, Debtor
       James C. Hunt, Attorney for the Debtor
       Mark T. McCarty, Chapter 13 Standing Trustee